Case No. 15-2000

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**KATHERINE DENDEL,**

　　　　Petitioner-Appellant,

v.

**HEIDI WASHINGTON, ET AL**

　　　　Respondent-Appellee.

_____

Habeas Corpus Appeal from the United States District Court
Eastern District of Michigan Southern Division
Honorable David M. Lawson
_____

**PETITIONER-APPELLANT'S AMENDED BRIEF**
_____

**STATE APPELLATE DEFENDER OFFICE**

**BY: VALERIE R. NEWMAN (P47291)**　　　**KRISTIN LAVOY (P71145)**
　　　Assistant Defender　　　　　　　　　Assistant Defender
　　　3300 Penobscot Building　　　　　　3300 Penobscot Building
　　　645 Griswold　　　　　　　　　　　645 Griswold
　　　Detroit, Michigan 48226　　　　　　Detroit, Michigan 48226
　　　(313) 256-9833　　　　　　　　　　(313) 256-9833
　　　vnewman@sado.org　　　　　　　　klavoy @sado.org

# <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................. i

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ....................................1

**STATEMENT OF JURISDICTION**................................................................2

**STATEMENT OF ISSUES PRESENTED** .................................................3

**STATEMENT OF THE CASE**................................................................4

**SUMMARY OF ARGUMENT** ...........................................................32

**STANDARD OF REVIEW** ................................................................34

**I.   THE AIT LAB RESULTS WERE TESTIMONIAL UNDER**
**   *MELENDEZ-DIAZ* AND THEIR ADMISSION THROUGH DR.**
**   EVANS, WHO DID NOT PERFORM THE TESTS, VIOLATED MS.**
**   DENDEL'S RIGHT TO CONFRONT HER ACCUSER** ..........................36**

**II.  MS. DENDEL'S SIXTH AMENDMENT RIGHT TO EFFECTIVE**
**   ASSISTANCE OF COUNSEL WAS VIOLATED WHERE TRIAL**
**   COUNSEL (A) FAILED TO INVESTIGATE AN ALTERNATIVE**
**   CAUSE OF DEATH OTHER THAN HYPOGLYCEMIA, AND (B)**
**   FAILED TO CALL ANY MEDICAL EXPERT WITNESSES.** ................41**

**CONCLUSION AND RELIEF SOUGHT**.........................................59

**CERTIFICATE OF COMPLIANCE** ................................................60

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**.........63

VRN*Brief Final wTRIM.docx*21237

Katherine Sue Dendel

# TABLE OF AUTHORITIES

## CASES

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)..............................................................37

*Byrd v. Trombley*, 580 F. Supp. 2d 542 (E.D. Mich. 2008).....................................49

*Chapman v California,* 386 US 18 (1967)................................................................37

*Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011)................................................. 47, 53

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................................. passim

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)......................................................38

*Dickerson v. Bagley,* 453 F.3d 690 (6th Cir.2006) .................................................43

*Foster v. Withrow*, 159 F. Supp. 2d 629 (E.D. Mich. 2001) ..................................37

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir.2005) ................................................49

*Hanna v. Ishee*, 694 F.3d 596 (6th Cir. 2012) ........................................................34

*Harrington v. Richter*, 131 S. Ct. 770 (2011) .........................................................41

*Jensen v. Romanowski*, 590 F.3d 373 (6th Cir. 2009) .............................................37

*Kotteakos v. United States*, 328 U.S. 750 (1946) ...................................................37

*Magana v. Hofbauer*, 263 F.3d 542 (6th. Cir. 2001)..............................................54

*Melendez-Diaz v Massachusetts,* 557 U.S. 305 (2009) .................................... 30, 36

*Michigan v. Bryant*, 131 S. Ct. 1143 (2011)...........................................................30

*People v. Dendel*, 2006 WL 2000148 (Mich. Ct. App. July 18, 2006)...... 29, 50, 56

*People v. Dendel*, 2008 WL 4180292 (Mich. Ct. App. Sept. 11, 2008)..................30

*People v. Dendel*, 748 N.W.2d 859 (Mich. 2008) ...................................................29

*People v. Dendel*, 750 N.W.2d 165 (Mich. 2008) ...................................................29

*People v. Dendel*, 760 N.W.2d 482 (Mich. 2009) ...................................................30

*People v. Dendel*, 773 N.W.2d 16 (Mich. 2009) .....................................................30

*People v. Dendel*, 793 N.W.2d 240 (Mich. 2011) ...................................................30

*People v. Dendel*, 797 N.W.2d 645 (Mich. Ct. App. 2010) ...................................30

*People v. Dendel*, 802 N.W.2d 618 (Mich. 2011) ( .................................................30

*People v. Ginther,* 212 N.W.2d 922 (Mich. 1973 .....................................................4

*Rayner v. Mills*, 685 F.3d 631 (6th Cir. 2012).........................................................35

*Rompilla v. Beard*, 545 U.S. 374 (2005) ..................................................................53

*Rose v. Lee*, 252 F.3d 676 (4th Cir. 2001) ...............................................................55

*Scott v. Bock*, 241 F. Supp. 2d 780 (E.D. Mich. 2003)...........................................37

*Stallings v. Bobby*, 464 F.3d 576 (6th Cir. 2006) ...................................................38

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................ passim

*Titlow v. Burt*, 680 F.3d 577 (6th Cir. 2012) .................................................... 43, 49

*United States v. Day*, 969 F.2d 39 (3rd Cir. 1992) ..................................................54

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................... 34, 51, 55

## STATUTES

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 2253 ..................................................................................2

28 U.S.C. § 2254 ..................................................................................2

28 U.S.C. § 2254(d)(2)........................................................................34

28 U.S.C. § 2254(e)(1)........................................................................34

28 U.S.C. §2254(d) .............................................................................34

28 U.S.C. §§ 1331, 1334, 2201, 2202..................................................2

U.S. Const. amends VI, XIV...............................................................36

## RULES

F.R.A P. 32(a)(7)(B) ...........................................................................60

## <u>Statement In Support of Oral Argument</u>

Petitioner-Appellant Katherine Dendel hereby requests that this Court grant oral argument in this matter. Oral arguments would benefit the court in that this case has a complicated and protracted procedural history and is fact intensive. Counsel's knowledge of the case and this history will be of benefit for any questions the Court may have regarding the facts and issues in the case.

## **Statement of Jurisdiction**

Petitioner Katherine Dendel timely filed a petition for a writ of habeas corpus on September 19, 2012. The district court had subject matter jurisdiction through its federal question jurisdiction. 28 U.S.C. §§ 1331, 1334, 2201, 2202. This action was brought under 28 U.S.C. § 2254 and alleged that Ms. Dendel was being detained unconstitutionally because she was denied her right to effective assistance of counsel, her right to confront witnesses, and by the prosecution's failure to present sufficient evidence in violation of her federal constitutional rights.

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291, which provides jurisdiction for appeals from final decisions of district courts, and under 28 U.S.C. § 2253, which specifically provides that a district court's final order in a habeas corpus proceeding is subject to appellate review by the court of appeals for that circuit.

The district court entered final Judgment and an Opinion and Order denying Ms. Dendel's petition for writ of habeas corpus on July 22, 2015. Ms. Dendel filed a timely Notice of Appeal on August 20, 2015. The district court issued an order granting in part a Certificate of Appealability as part of its opinion on July 22, 2015, with respect to the issues raised herein. Ms. Dendel did not file for a certificate of appealability on the remaining issue presented in the habeas petition.

## <u>Statement of Issues Presented</u>

I.    The Michigan Court of Appeals unreasonably applied United States Supreme Court law in finding that the Confrontation Clause violation in this case was harmless when the cause of death was the key question in this case.

II.    The Michigan Supreme Court unreasonably applied United States Supreme Court law when it found that trial counsel did not provide constitutionally ineffective assistance.

## Statement of the Case

## Introduction

Judge Schmucker, sitting as the trier of fact in this matter, acquitted Petitioner Katherine Sue Dendel of first-degree murder, finding her guilty of second-degree murder in the death of Paul Michael Burley. RE #8-9, Trial Transcript (TT), Page ID #1327-1330. Deviating downward from the guidelines, he sentenced Ms. Dendel to a minimum term of 90 months and a maximum term of 180 months with credit for 302 days served. RE #8-10, Sentencing, Page ID #1354.

This case arose after Mr. Burley was discovered deceased on April 4, 2002 in the apartment that he shared with Ms. Dendel. The prosecutor's theory was that Ms. Dendel injected the gravely ill Mr. Burley with insulin because she was interested in receiving the benefits of his life insurance policies, valued at $25,000, and because she was tired of caring for him. RE #8-9, TT, Page ID #1295-1296. The defense theory at trial was that Mr. Burley either died of natural causes or committed suicide by injecting himself with insulin. RE #8-9, TT, Page ID #1297-1298. The focus of the later *Ginther*[1] hearing was Mr. Burley's cause of death, which, as the defense expert testified, was due to a multiple-drug overdose because of the quantity and number of medications Mr. Burley was taking. RE #8-14, *Ginther* Transcript (GH), Page ID #1466. Ms. Dendel pled not guilty and

---

[1] *People v. Ginther,* 212 N.W.2d 922 (Mich. 1973).

throughout the trial maintained that she did not give Mr. Burley insulin in any form. RE #8-10, Sentencing, Page ID #1355; RE #8-9, TT, Page ID #1241, 1243, 1254.

### Caretaking & Relationship History

Ms. Dendel had been in a relationship with Mr. Burley since 1975, when she was about twenty-one years old. RE #8-9, TT, Page ID #1221; RE #8-7, TT, Page ID #950. They initially lived in Michigan but moved away in hopes that a new environment would help Mr. Burley recover from his drug addiction. RE #8-9, TT, Page ID #1221.

Ms. Dendel graduated from high school, obtained her Associates Degree in accounting and became licensed as a beautician in 1969. RE #8-9, TT, Page ID #1219-1220. In 1976, when she was about twenty-two years old, the couple was informed by a Texas judge that they had a common-law marriage. RE #8-9, TT, Page ID #1223. Although never officially married, Ms. Dendel and Mr. Burley, as well as their neighbors and Mr. Burley's parents, saw themselves as married. *E.g.*, RE #8-7, TT, Page ID #893.  Ms. Dendel took Mr. Burley's last name and changed her social security card to Katherine Burley. RE #8-9, TT, Page ID #1224.

Ms. Dendel and Mr. Burley moved together to Texas, California, and Pennsylvania before moving back to Michigan in 1995.[2] RE #8-9, TT, Page ID #1224-1225. Because Mr. Burley required full time care at this point, Ms. Dendel became Mr. Burley's official caregiver, receiving a monthly income of $730 from the Family Independence Agency (FIA). RE #8-7, TT, Page ID #901, 1105. To further supplement the couple's income, Ms. Dendel opened an eBay clothing business, through which she sold clothes she sewed at home. RE #8-7, TT, Page ID #956, 1003-1004; RE #8-9, TT, Page ID #1220. Mr. Burley and Ms. Dendel lived in a subsidized-housing complex called Reed Manor. RE #8-9, TT, Page ID #1231. They qualified based on Mr. Burley's Social Security Disability status, and the housing cost them $150 a month. RE #8-9, TT, Page ID #1275-1276. By 2002, Mr. Burley received about $520 a month because of his disability status. RE #8-9, TT, Page ID #1230.

Due to his many illnesses, Ms. Dendel spent most of her time tending to Mr. Burley. RE #8-7, TT, Page ID #1002. In 2002, his illnesses included Hepatitis C, Hepatitis B, herpes, Chronic Obstructed Pulmonary Disease, throat cancer, HIV, neuropathy in his legs and feet, and epilepsy. RE #8-9, TT, Page ID #953, 999-

---

[2] Ms. Dendel single-handedly supported the couple by working as a legal secretary, in retail accounting, and in the payroll department at the Mobile Oil headquarters. RE #8-9, TT, Page ID #1222, 1226-1227. Mr. Burley had not worked since the mid 1980's.  RE #8-9, TT, Page ID #1230.

1000, 1092; RE #8-5, TT, Page ID #798-799. He also had severely impaired vision and two paralyzed fingers. RE #8-9, TT, Page ID #1194, 1229.

When the police seized Mr. Burley's medication after his death, they took nineteen different pill bottles. RE #8-5, TT, Page ID #763. If he missed these regular medications, he would have seizures. RE #8-9, TT, Page ID #1232. Ms. Dendel had to hide some of his medications because Mr. Burley would abuse them. RE #8-9, TT, Page ID #1235.

Mr. Burley found out he had HIV in 1997 RE #8-9, TT, Page ID #1232. As he grew more ill, his family became more distant. *See, e.g.*, RE #8-9, TT, Page ID #1261. His sister voiced concerns about his HIV spreading to others. RE #8-5, TT, Page ID #, 742, 744; RE #8-7, TT, Page ID #1091. He was not invited to any Easter celebrations or to watch the Super Bowl with his brother as he had done annually RE #8-7, TT, Page ID #912, 935. At the last minute, his family disallowed him to take a trip to Florida to stay in his brother's home RE #8-7, TT, Page ID #911. Watching Mr. Burley's family dissociate themselves from Mr. Burley as he became more ill was frustrating to Ms. Dendel who stood by his side and gave him around-the-clock care, feeding him, organizing his doctor appointments, administering his medications, and changing his diapers. RE #8-9, TT, Page ID #, 1236-1238, 1261, 1270-1271. As Ms. Dendel reflected:

> "[t]hey were terribly scared of his disease and [did] not come to visit him. They didn't visit him in the hospital. A

lot of time they would say they were too busy, or in the shower, or lie and not talk to him on the phone when he would call their homes." RE #8-9, TT, Page ID #1261.

Mr. Burley was regularly taken to the hospital and had just been released the Thursday before his death after receiving treatment for pneumonia. RE #8-9, TT, Page ID #1235-1236; RE #8-7, TT, Page ID #, 940, 1134-1135. As Paula Toves, Mr. Burley's sister, testified regarding Mr. Burley's hospital visits: "[I]t's a regular occurring thing, and he's just weak, and they pump him up with antibiotics and send him home." RE #8-7, TT, Page ID #1134-1135.

Mr. Burley was not easy to handle. He had a hard time finding doctors because he had difficulty communicating with many of them. RE #8-9, TT, Page ID #1233. He was uncooperative at the hospital and even had to be strapped down during a recent visit to Foote Hospital. RE #8-9, TT, Page ID #1234. On the day before Mr. Burley's death, Kimberly Curl from Foote Home Health closed Mr. Burley's case for noncompliance. . RE #8-7, TT, Page ID #, 1063-1064.

Especially in the days before Mr. Burley's death, Ms. Dendel was working to find someone to help with his caretaking because he was having memory problems and hallucinations more frequently. RE #8-9, TT, Page ID #1186, 1269. A week before his death, Kimberly Curl from Foote Home Health visited the home to help Mr. Burley with his dementia and found that he was quite confused. RE #8-7, TT, Page ID #1065. Two days later, on March 28, Ms. Dendel emailed Susan

Jones from FIA to inform her that that Mr. Burley had been released from the hospital and to ask if she had suggestions for help. RE #8-7, TT, Page ID #1108. The following day, Ms. Dendel called the Department of Aging to see if they could help her in caring for Mr. Burley, but they were all unable to help her. RE #8-7, TT, Page ID #, 1051-1052.

Ms. Dendel also faced medical problems. She had Type II diabetes, for which she took insulin pills with meals and injected insulin twice a day. RE #8-7, TT, Page ID #954-955. She was also having respiratory problems. RE #8-7, TT, Page ID #900, 1008.

### April 2, 2002: Mike Burley's Death

Around 3:00 am on April 2, 2002, the day of Mr. Burley's death, Ms. Dendel called the police because Mr. Burley had been running around the house with a butter knife and talking about imaginary people. RE #8-7, TT, Page ID #1117, 1120. When the police arrived, however, they found Mr. Burley sitting quietly in a chair. RE #8-7, TT, Page ID #1119, 1121. Ms. Dendel told the police that while Mr. Burley certainly did not intend to put her or himself in danger, she was very concerned that his dementia would lead him to accidentally harm himself and recommended he be placed in a psychiatric ward at Foote Hospital. RE #8-7, TT, Page ID #1121-1122, 1125; RE #8-7, TT, Page ID #1240. The police, however, concluded that Mr. Burley was not a threat to himself or others so left him at home. RE #8-7, TT, Page ID #1125-1126.

Later that day, Ms. Dendel woke up before Mr. Burley and left the home around 9:00 or 10:00 am for a doctor's appointment to retake a CAT scan. RE #8-9, TT, Page ID #1241-1242. On her way home, Ms. Dendel stopped at Marlin Manor to check into nursing-home type placement for Mr. Burley. RE #8-9, TT, Page ID #1242-1243. She returned home around noon or 1:00 pm. RE #8-9, TT, Page ID #1243. Upon her return, Ms. Dendel gave Mr. Burley some cake. RE #8-9, TT, Page ID #1244. Ms. Dendel was surprised that Mr. Burley ate two pieces of

cake because he was anorexic. *Id.* at 1244; RE #8-7, TT, Page ID #1094. In fact, Mr. Burley's appetite was so small that he was tube fed for two years, only recently being able to eat without the tube. RE #8-7, TT, Page ID #1026, 1094-1095.

Ms. Dendel ate her lunch and went into the bedroom. RE #8-9, TT, Page ID #1245. While in the bedroom, she did some sewing and called some agencies about her respiratory problems and about placing Mr. Burley in a nursing home. RE #8-9, TT, Page ID #1245-1246. Toward the end of the afternoon, she called her close friend Ms. Aida Winters. RE #8-9, TT, Page ID #1246. During her phone call with Ms. Winters, she realized that she had not checked on Mr. Burley for a couple of hours. RE #8-9, TT, Page ID #1246, 1254; RE #8-7, TT, Page ID #927.

Accordingly, Ms. Dendel got off the phone around 5:00 pm and went to check on Mr. Burley. RE #8-9, TT, Page ID #1254; RE #8-7, TT, Page ID #902. She then noticed that something was wrong because he looked purple. RE #8-9, TT, Page ID #1254. Immediately thereafter, she called Ms. Winters for help. RE #8-9, TT, Page ID #1256; RE #8-7, TT, Page ID #902-903.

Ms. Winters was not only a close friend of Mr. Burley's mother and Ms. Dendel, but Ms. Dendel had helped Ms. Winters when her father passed away. RE #8-7, TT, Page ID #894-899, 893. Thus, Ms. Winters pre-arranged to help Ms. Dendel when something happened to Mr. Burley. RE #8-7, TT, Page ID #893. As

Ms. Winters stated, "I said who's going to be there for you, Kathy? Because, you know, with all of the things that Mike had, we figured, you know, some point in time he would pass." *Id*. Ms. Winters arrived within five to ten minutes and checked Mr. Burley. RE #8-7, TT, Page ID #902-905; RE #8-9, TT, Page ID #1254. She verified that he had passed. RE #8-7, TT, Page ID #905; RE #8-9, TT, Page ID #1191. Ms. Dendel started screaming because at that point it was obvious Mr. Burley was dead. RE #8-7, TT, Page ID #929. Because Ms. Dendel was agitated and screaming, Ms. Winters told her that she would call 911; Ms. Dendel directed her to the phone in the bedroom. RE #8-7, TT, Page ID #905; RE #8-9, TT, Page ID #1254.

The police arrived first at Ms. Dendel's apartment, and the medics arrived several hours later to take Mr. Burley's body. RE #8-7, TT, Page ID #906. Ms. Dendel was crying and upset during the visit, and Ms. Winters and the officers consoled her. RE #8-5, TT, Page ID #757, 764; RE #8-7, TT, Page ID #908. As the ambulance worker confirmed, she acted the way "anyone [would] who found a loved one passed away." RE #8-5, TT, Page ID #778.

While talking with the police, one of Mr. Burley's sisters called Ms. Dendel's apartment. RE #8-5, TT, Page ID #778. Ms. Dendel asked her to call later. *Id.*; RE #8-7, TT, Page ID #1098. After the call, Ms. Dendel explained to the police that there was animosity between her and the family and she did not feel

comfortable telling them about Mr. Burley. RE #8-5, TT, Page ID #762. As Ms. Winters explained at trial, Ms. Dendel felt that "because of the difficulties that she had been having with the family and [she] didn't feel they were supportive of her in dealing with Mike that if they didn't want to have anything to do with him in life, they shouldn't really have anything to do with him in death." RE #8-7, TT, Page ID #917-918. Detective Scarpeno told Ms. Dendel that she should inform the family of Mr. Burley's death within a week. RE #8-9, TT, Page ID #1261.

Ms. Dendel also questioned the medics about what would happen to Mr. Burley's body: "She was asking about procedures and how the body would be taken away for cremation and like that, what deemed necessary for an autopsy or not."[3] RE #8-5, TT, Page ID #781. The officers collected Mr. Burley's pill bottles and left around 9:30 pm. RE #8-5, TT, Page ID #763; RE #8-7, TT, Page ID #913. Ms. Winters stayed with Ms. Dendel for another hour to console her. RE #8-7, TT, Page ID #912-913.

In the two days after Mr. Burley's death, Ms. Winters spent most of her time with Ms. Dendel, providing support for her and going with her to organize funeral and cremation services for Mr. Burley. RE #8-7, TT, Page ID #913, 915. Mr. Burley and Ms. Dendel had discussed cremation before Mr. Burley died. RE #8-9,

---

[3] As Mr. Ackley testified, Ms. Dendel's concern for what would happen to Mr. Burley was typical of grieving family members: "I've had other family members talk about autopsies but they were just dealing with medical instances, patient expired from medical circumstances and apparently didn't want to be put through that." RE #8-5, TT, Page ID #786.

TT, Page ID #1252-1253. Although Mr. Burley's family had called Ms. Dendel after his death, Ms. Dendel had simply told them that Mr. Burley was in the hospital. RE #8-7, TT, Page ID #1134; RE #8-8, TT, Page ID #, 1150; RE #8-9, TT, Page ID #1258-1259. Ms. Dendel explained to Ms. Winters that she was having a hard time bringing up the subject with Mr. Burley's family "because of the difficulties that she had been having with the family and they didn't feel they were supportive of her in dealing with Mr. Burley." RE #8-7, TT, Page ID #917.

Because Ms. Dendel was still having a hard time dealing with Mr. Burley's death after a few days, Ms. Winters recommended she visit her sister, which Ms. Dendel did. RE #8-7, TT, Page ID #913, 921; RE #8-9, TT, Page ID #, 1249. While Ms. Dendel was away, Mr. Burley's sister, Ms. Toves, called Ms. Winters to ask about Mr. Burley. RE #8-7, TT, Page ID #917. Ms. Dendel called Ms. Winters from her sister's house and Ms. Winters told her that Ms. Toves called. *Id*. Ms. Winters offered to inform Mr. Burley's family of his death, and Ms. Dendel accepted. RE #8-7, TT, Page ID #918. Ms. Winters told Mr. Burley's family about his death the following day. *Id.*; RE #8-9, TT, Page ID #1249.

## Investigation and Arrest

Mr. Burley's body sat at his home for several hours before the medics arrived and took him to Foote Hospital. . RE #8-7, TT, Page ID #906. The body sat overnight at the hospital, and at 4:30 the next day, the medical examiner, Dr.

Pacris, did an autopsy. RE #8-5, TT, Page ID #794-795. Before the examination began, Dr. Pacris gathered part of Mr. Burley's medical history: that he was positive for Hepatitis C, HIV positive, and was taking Phenobarbital and morphine. RE #8-5, TT, Page ID #796-797. Dr. Pacris received information about some of the nineteen medications Mr. Burley was taking at the time of his death. RE #8-5, TT, Page ID #828. In the course of the autopsy, Dr. Pacris observed signs in the organs that were consistent with a history of drug use and Mr. Burley's medical history. RE #8-5, TT, Page ID #802-803. He determined the death was due to natural causes or a morphine overdose. RE #8-5, TT, Page ID #805; RE #14, GH, Page ID#1402.

However, the officers investigating Mr. Burley's death conveyed to Dr. Pacris their suspicions that Mr. Burley might have died due to an insulin injection. RE #8-5, TT, Page ID #803. This was based on a statement by Mr. Burley's sister claiming that Ms. Dendel had once said that she was so fed up that she may inject Mr. Burley with insulin. RE #8-7, TT, Page ID #969. Based on this information, Dr. Pacris requested tests of the insulin levels in Mr. Burley's blood and vitreous (eye) fluid from AIT Laboratories. RE #8-5, TT, Page ID #803-804. He also requested tests of Mr. Burley's C-Peptides in order to detect signs of insulin injection. *Id.*

Despite the suspicions, however, the blood and vitreous insulin tests came

back "normal." RE #8-5, TT, Page ID #805. The glucose levels in both tests came back as "zero," which is "normal" according to Dr. Pacris because one's glucose level drops almost instantly upon death. *Id.* The C-Peptides tested were within normal limits. RE #8-14, GH, Page ID#1507. The report also noted that Mr. Burley's blood morphine level was at 328, three to four times the normal therapeutic range of 30-100 and within the "lethal range" of morphine. RE #8-5, TT, Page ID #812.

Through the autopsy, Dr. Pacris identified hypoxic changes in the brain and evidence of shock in the kidney. RE #8-5, TT, Page ID #805, 825. Dr. Pacris later testified that he relied on these autopsy findings, and not the toxicology report, when he subsequently changed the cause of death to "complication of hypoglycemia," which can be caused by insulin injection. RE #8-5, TT, Page ID #805, 807; RE #8-14, GH, Page ID #1493.

Ms. Dendel was arrested on May 15, 2002. RE #8-9, TT, Page ID #1173-1174. A police officer noticed a discrepancy in the death certificate, namely that he saw both of the names "Ms. Burley" and "Katherine Dendel" used during the investigation. *Id.* Ms. Dendel cleared up the name discrepancy by explaining her understanding of the common-law marriage. RE #8-9, TT, Page ID #1182-1183. She further verified that she had six insurance policies on Mr. Burley with herself as the beneficiary, and that while the total value of the policies was $25,000, some

of the policies had not reached their maturity date. RE #8-9, TT, Page ID #1183-1185. She continued to explain that at least one of the policies was 53 days from maturity when Mr. Burley passed. RE #8-9, TT, Page ID #1184-1185. Mr. Burley had been aware of and signed the insurance policies. RE #8-9, TT, Page ID #1184.

At the interview, the officer told Ms. Dendel that the possible cause of death was hypoglycemic shock due to insulin injection. RE #8-9, TT, Page ID #1196. Upon hearing this news, Ms. Dendel responded that either Mr. Burley must have committed suicide or someone must have gone into their home and given him insulin. RE #8-9, TT, Page ID #1196-1197. Although it turned out to be an inaccurate statement, the officer told Ms. Dendel that the medical examiner had detected insulin in the body fluids. RE #8-9, TT, Page ID #1198. Ms. Dendel, being a diabetic, responded that the officer was lying and that insulin could not be detected in the body after death. RE #8-9, TT, Page ID #1199.

Finally, the officer hypothesized with Ms. Dendel that because of her apparent love for Mr. Burley, she might have assisted his suicide. RE #8-9, TT, Page ID #1199-1200. She indicated that Mr. Burley was hard to deal with due to his dementia, and that "he simply was not right in his mind and he did things that were odd and difficult." RE #8-9, TT, Page ID #1186-1187. She nonetheless vowed to take care of him until he found a place he would be comfortable. As she explained, "it would take a special person to actually care for him, and she wanted

17

to make sure that she was going to find someone that was willing to do so." RE #8-9, TT, Page ID #1187. Ms. Dendel further explained that she did care for Mr. Burley very dearly and realized that he was nearing the end of his life, but his religion disallowed suicide, so she did not assist him in a suicide. RE #8-9, TT, Page ID #1199-1200

## **Trial Preparation**

In preparation for trial, Ms. Dendel's defense counsel spoke to two doctors about the case. RE #8-14, GH, Page ID#1418. Trial counsel first spoke to Dr. Michael Burgess, his personal friend and doctor, who referred him to Dr. Halsey, an endocrinologist. *Id.* Nothing either doctor said served to undermine the autopsy results of Dr. Pacris or AIT Labs. RE #8-14, GH, Page ID#1419. Because of this, trial counsel decided not to hire an expert or expert witnesses for trial.

After trial, a *Ginther* hearing was conducted. RE #8-14, GH, Page ID#1399-1447. Defense counsel admitted that he did not fully investigate an alternative cause of death and that his investigation was based primarily on his brief conversations with the two doctors. *See, e.g.*, RE #8-14, GH, Page ID#1418-1420. Trial counsel did not provide either doctor with Mr. Burley's medical records or any documentation about the case. RE #8-14, GH, Page ID#1432. Trial counsel took no notes to memorialize his conversations with either doctor. RE #8-14, GH, Page ID#1427-1429.

18

To prepare a defense, trial counsel spoke to Ms. Dendel, whom he described as being "fairly definite" with regard to pursuing a defense based on a theory that Mr. Burley had committed suicide. *Id.* at 24. At trial, however, Ms. Dendel testified that Mr. Burley would not have committed suicide due to his Catholic faith. RE #8-9, TT, Page ID#1285.

## **Trial**

At trial, the prosecution relied on the testimony of seventeen witnesses, including three expert witnesses: Dr. Pacris, Dr. Evans, and Dr. Freeman. RE #8-7, TT, Page ID#1034; RE #8-5, TT, Page ID#794, 838. The defense called no expert witnesses and called only Ms. Dendel to rebut the prosecution's case. RE #8-9, TT, Page ID#1219.

Dr. Pacris testified that Mr. Burley died of complications from hypoglycemic shock, which could have been the result of an insulin injection. RE #8-5, TT, Page ID#, 807. He based his findings on hypoxic changes in the brain and shock kidney, which he identified in the course of his autopsy. RE #8-5, TT, Page ID#805, 807. He also testified that he did not believe the lethal levels of morphine in Mr. Burley's blood were the cause of death because of Mr. Burley's history of drug use.[4] RE #8-5, TT, Page ID#813.

---

[4] The findings of Dr. Pacris, as well as those of Dr. Evans, are discussed more fully below.

Dr. Evans, the President and CEO of AIT Labs, testified for the prosecution as an expert in toxicology about the toxicology results. RE #8-5, TT, Page ID#, 834-853; RE #8-6, TT, Page ID#, 857-885. He also testified about the effects of insulin on glucose levels. *E.g.*, RE #8-6, TT, Page ID#858. On cross-examination, it was established that Dr. Evans did not conduct the toxicology tests for which he was providing testimony, but rather other people in the lab had performed those tests. RE #8-6, TT, Page ID#868-869. Defense counsel objected to his testimony on hearsay grounds,[5] which was overruled.  RE #8-6, TT, Page ID#869.

In his summation, defense counsel argued, without conceding that Ms. Dendel had killed Mr. Burley, that if the trial court found that she had in fact killed him, then the court also needed to consider the stressful context of the scenario in order to reduce the charge to manslaughter. RE #8-9, TT, Page ID#1306-1307.

## Trial Court's Findings

The trial judge determined that Mr. Burley died from an insulin injection, which could only have been administered by Ms. Dendel since he believed Mr. Burley was too weak to inject himself. RE #8-9, TT, Page ID#1319-1321. In delivering the verdict, the judge relied on "the hypoxic findings in the brain, the kidney, and the zero glucose level" to determine the cause of death. RE #8-9, TT, Page ID#1318. The judge discounted the possibility of a morphine overdose

---

[5] This testimony was elicited at trial on February 3, 2003, prior to the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).

stating, "there's some suggestion that there was a lethal level of morphine in there. I really don't — I'm not convinced at all that that's the cause of death because of his history of use." *Id.* As a result of these findings, the trial court judge found Ms. Dendel guilty of second-degree murder. RE #8-9, TT, Page ID#1330.

### **Relied Upon Evidence**

At the subsequent *Ginther* hearing, Appellate Counsel called Dr. Laurence Simson Jr., a forensic pathologist, who provided an alternate explanation for Dr. Pacris's data. RE #8-14, GH, Page ID#1447, 1466. Dr. Simson reviewed all of Mr. Burley's records and wrote a report disagreeing with many of the findings of Dr. Pacris. RE #8-14, GH, Page ID#1450, 1455. As a general conclusion, Dr. Simson reported that Dr. Pacris's view that Mr. Burley died of an insulin injection was not significantly supported by available pathological/ toxicological findings. RE #8-14, GH, Page ID#1455.

### **Zero Glucose Level**

The first piece of evidence relied on by the trial judge in finding cause of death was the glucose result. RE #8-9, TT, Page ID#1318. Both the blood and the vitreous insulin test results came back from AIT Laboratories "normal." RE #8-5, TT, Page ID#805; RE  #8-14, GH, 1507. The glucose levels came back as zero, and Dr. Pacris testified regarding these results, saying this was "normal" since one's glucose level drops almost instantly upon death. RE #8-5, TT, Page ID#805.

He also testified that, "[h]ypoglycemia cannot be diagnosed in dead people because once you die glucose just drop [sic] to zero, okay." *Id.* Dr. Pacris observed no needle marks on the body of Mr. Burley. RE #8-5, TT, Page ID#808. He testified that his altered diagnosis was not based on the toxicology report from AIT Labs related to insulin and glucose levels. RE #8-5, TT, Page ID#805, 807; RE #8-14, GH, Page ID#1493.

At the *Ginther* hearing, Dr. Simson agreed with Dr. Pacris regarding the significance of the glucose findings RE #8-14, GH, Page ID#1455. He explained that once a person dies, the glucose in the blood and vitreous can go to zero within 24 hours. RE #8-14, GH, Page ID#1457. Dr. Simson thus concluded that since Mr. Burley was not autopsied for at least 24 hours, a finding of zero glucose has no meaning at all. *Id.* Further, the zero glucose must have been a result of the 24-hour collection time because if one was injected with insulin, one's glucose levels would fall near zero but would never completely reach zero. *Id.* Essentially, when one dies of insulin injection, the brain is being deprived of necessary glucose, and the brain is dying due to glucose deprivation long before the glucose levels actually reach zero. Thus, a person would "die [from hypoglycemia with] a 20, 25, 30 milligram percent glucose in [their] blood." *Id.*

However, at trial, Dr. Michael Evans, the president and CEO of AIT Laboratories, also testified about the relationship between insulin and glucose

levels and the body's response to insulin. *E.g.*, RE #8-6, TT, Page ID#858. Although he had not conducted the tests himself, he described the process of testing the samples received in Mr. Burley's examination. He stated,

> We received two tubes of blood, they were orange colored topped. We received one bottle of blood, red colored, top. We used a color top to help identify what the container is. So, it's part of way of tying down a little bit better the chain of custody, what we received versus what they may have sent. So, we identify. We received one bottle of urine, yellow top and we received one tube of vitreous fluid, white top. RE #8-5, TT, Page ID#843.

> We do testing of the vitreous for alcohols and that includes methanol, isopropunol, (phonetic) acetone and ethanol, which is drinking alcohol. RE #8-5, TT, Page ID#845.

After describing the process by which the technician would identify the sample and perform the tests, he described the relevance of insulin and how it works in response to glucose. RE #8-6, TT, Page ID#857-858. He stated that insulin works to lower the blood sugar so that cells can operate. If the body does not have enough glucose, then the brain cells will shut down. *Id.* He emphasized that "one of the key factors of glucose levels is insulin." RE #8-6, TT, Page ID#858.

The prosecution asked Dr. Evans, "what…your report indicate[s] . . . regard[ing] . . . any testing that you may have done with regard to glucose?" RE #8-6, TT, Page ID#859. Dr. Evans replied that, "We were asked to perform morphine, vitreous electrolytes, insulin and C-peptide, which is---goes along with

23

insulin….And that result shows that glucose in the vitreous fluid, we have a level of zero." RE #8-6, TT, Page ID#860. Based on the test results, he testified that the zero glucose level was consistent with Mr. Burley being injected with insulin. *Id.* Dr. Evans stated that the lowering of the glucose would be supportive, but not proof, of the theory that insulin was used to lower the glucose level. *Id.*

In his findings, the judge stated, "It seems to me the evidence is much, much stronger, and I find that he really died from having a zero glucose level." RE #8-9, TT, Page ID#1318. The judge therefore used the zero glucose level, which was discovered through testing completed by AIT Labs, to find that Mr. Burley died as a result of insulin. RE #8-9, TT, Page ID#1318-1319 ("So I think it's — to get the glucose to zero, I think the only way you can conclude, and I think it's been proved beyond any reasonable doubt, that he had — that somehow insulin, oral or by injection was — that he [sic] received that.").

### Hypoxic Changes in the Brain

The trial judge also relied upon the presence of microscopic hypoxic changes in the brain when determining cause of death. RE #8-6, TT, Page ID#1318. Dr. Pacris testified that because he saw these hypoxic changes, Mr. Burley must have been in a coma for "at least 12 hours." RE #8-5, TT, Page ID#807. Using this twelve-hour figure, Dr. Pacris testified "The story that I got from the police doesn't jive that he was seen around twelve o'clock, one o'clock

alive and then sudden dead at four o'clock p.m.[—]it doesn't match." RE #8-5, TT,

Page ID#810-811.

At cross-examination in the *Ginther* hearing, however, Dr. Pacris testified

that the twelve-hour figure is merely an estimate:

> [Textbooks are] going to say these changes in the brain who are
> comatose can be seen at least—it has wide variation, 12 to 24
> hours. But some structural changes like some vacuolization on
> the cell or red neurons—(undecipherable)—cytoplasm of the
> neurons can be observed as early as 2 to 4 hours. But it's a wide
> variation there but most of the standard textbooks say 12 hours.
> RE #8-14, GH, Page ID#1503.

Defense counsel at the *Ginther* hearing asked if there was a specific way to

measure changes in order to accurately determine the time the patient was

comatose. RE #8-14, GH, Page ID#1503. Dr. Pacris responded that there was,

> [n]othing like that, but if you see some changes in the brain like
> this, all you can do—all you can say is, he had been comatose
> for 12 hours. Some neuropathologists, textbook, will say two
> hours, you know, and who to believe, you know, it's—they're
> all reliable textbook [sic] and, you know. So, there's a wide
> range. RE #8-14, GH, Page ID#1504.

Additionally, Dr. Simson rejected Dr. Pacris's conclusions based on his

findings of hypoxic changes in the brain. Dr. Simson reported that since Mr.

Burley was not autopsied for at least 24 hours after he died, one cannot conclude

anything from hypoxic changes in the brain. *Id.* at 67. At post-mortem, the brain

continues to degrade in a way that causes hypoxic changes. *Id.* Thus, these changes

that Dr. Pacris observed may just be due to the late collection time. *Id.*  Further,

because Mr. Burley had AIDS (which causes changes in the neurons similar to what a doctor would classify as hypoxic changes in a healthy person), the relationship between hypoxic changes and a comatose state may not apply to Mr. Burley. *Id.* Finally, speaking to Dr. Pacris's finding that Mr. Burley had been comatose for twelve hours, he testified, "I just do not think that there's—that there's anything in the literature that would support, that I could find, that would support that specific a conclusion." *Id.*

### Signs of Shock in the Kidney

Although relied on less by the court, Dr. Pacris also made findings that he microscopically found changes of acute tubular necrosis in the kidneys. RE #8-5, TT, Page ID#825. From this he concluded that the kidneys were in shock before Mr. Burley's death. *Id.*

Dr. Simson reported, however, that Dr. Pacris's diagnosis of shock kidney "is internally inconsistent within the autopsy report." RE #8-14, GH, Page ID#1462. In the gross autopsy, the kidneys were described as normal. RE #8-14, GH, Page ID#1463. A normal kidney, Dr. Simson explained, has a reddish color while a shock kidney has a tan color. *Id.* Dr. Simson testified that he looked at the kidney under the microscope, and it did not look like shock kidney. *Id.* He further testified that the description of the kidney from Dr. Pacris's gross autopsy records "described [the kidney] entirely wrong for being a shock kidney." *Id.* Thus, he

concluded that Dr. Pacris's finding of necrosis in the proximal tubules (or, portions of the kidney unit) must simply be postmortem changes that took place in the time between the death and autopsy. RE #8-14, GH, Page ID#1481-1482.

### Morphine or Multiple Drug Overdose

Dr. Pacris testified at trial that determining cause of death, absent any obvious wounds, is a process of "exclusion." RE #8-5, TT, Page ID#810, 819. After the first autopsy, Dr. Pacris found that the cause of death was natural. RE #8-14, GH, Page ID#1402. He then requested a toxicology report after speaking to the police, which revealed that Mr. Burleys' blood morphine level was 328, three to four times the normal therapeutic range of 30-100 and within the "lethal range" of morphine. RE #8-5, TT, Page ID#, 812. Mr. Burley was prescribed morphine for acute abdominal pain due to his HIV and lymphoma. RE #8-5, TT, Page ID#799. Dr. Pacris also observed water in Mr. Burley's lungs, which can be caused by drug overdose. RE #8-5, TT, Page ID#829. Despite this, Dr. Pacris dismissed morphine overdose as a cause of death because Mr. Burley had a history of drug use, which led Dr. Pacris to believe that Mr. Burley's tolerance might have been high enough to overcome even a lethal level of morphine. RE #8-5, TT, Page ID#813. On cross-examination, however, Dr. Pacris admitted that he did not receive any medical history or other proof that would indicate Mr. Burley ever abused morphine or used it other than for pain as prescribed. RE #8-5, TT, Page ID#814-815. Nowhere

else in the record is there any evidence of a narcotic dependency between 1999 and

Mr. Burley's death in 2002.

In ruling out morphine as the cause of death, Dr. Pacris also noted that the

morphine could not have caused the hypoxic changes he observed in the brain

because those changes were the result of a coma, and, according to Dr. Pacris,

most cases of morphine overdose would not cause a coma. A morphine overdose

would just cause the person to "drop dead." RE #8-5, TT, Page ID#810-811.

However, at trial he did indicate that the morphine could have been the cause of

death:

> Defense Counsel: Did you examine whether morphine
> usage in this case could have caused his death?
>
> Dr. Pacris: See, the cause of death is (inaudible)
> exclusion. If I don't suspect insulin and just morphine,
> probably yes, it might cause death. RE #8-5, TT, Page
> ID#810.

As to the possibility of complications from the combination from the

multiple drugs Mr. Burley was taking, Dr. Pacris stated that he was unfamiliar with

most of those drugs and was not a clinician so could not speak to the side effects of

each, nor to the effect they would all have in combination. RE #8-5, TT, Page

ID#820-822.

At the *Ginther* hearing, Dr. Simson explained that Dr. Pacris overlooked a

crucial fact: because Mr. Burley may have been comatose for a period of time, his

body would have continued to break down the morphine in his blood. RE #8-14, GH, Page ID#1463-1464. Thus, Dr. Simson stated that "at the time he collapsed, his morphine would have been not four time higher . . . but maybe 10 times higher." *Id.* Therefore, he concluded that morphine or multiple drug overdose was the cause of death. RE #8-14, GH, Page ID#1466.

## Trial Court's *Ginther* Findings

At the *Ginther* hearing, the trial court stated that he was "uncomfortable" with the fact that trial counsel did not memorialize either of his conversations with the two doctors with whom he briefly consulted. RE #8-14, GH, Page ID#1536. The trial court also stated that Dr. Simson's testimony would have helped the defense. *Id*. However, the trial court found that trial counsel's actions did not constitute ineffective assistance of counsel and, despite Dr. Simson's testimony, it was reasonably probable that the outcome would not have been any different. RE #8-14, GH, Page ID#1536-1537.

## Procedural History

Ms. Dendel appealed her conviction and, on March 11, 2005, the Court of Appeals remanded the case for a *Ginther* hearing. The trial court held that Ms. Dendel had received the effective assistance of counsel. RE #8-14, GH, Page ID#1536-1537.

On July 18, 2006, a majority of the Michigan Court of Appeals found that Ms. Dendel was denied the effective assistance of counsel. *People v. Dendel*, 2006 WL 2000148, at *3 (Mich. Ct. App. July 18, 2006)("*Dendel II*"). The court held that defense counsel's failure to undertake an adequate investigation of the cause of Mr. Burley's death denied Ms. Dendel the effective assistance of counsel. *Id.*

On May 28, 2008, the Michigan Supreme Court held that failure to produce an expert did not amount to ineffective assistance of counsel and remanded the case to the Court of Appeals for consideration of the remaining appellate issues. *People v. Dendel*, 748 N.W.2d 859, 870 (Mich. 2008)("*Dendel III* "); *People v. Dendel*, 750 N.W.2d 165 (Mich. 2008)("*Dendel IV*").

On remand, the Court of Appeals affirmed Ms. Dendel's conviction and sentence. *People v. Dendel*, 2008 WL 4180292 (Mich. Ct. App. Sept. 11, 2008)("*Dendel V*"). Appellate counsel appealed to the Michigan Supreme Court. On February 24, 2009, the Court held the case in abeyance pending the decision of *Melendez-Diaz v Massachusetts,* 557 U.S. 305 (2009). *People v. Dendel*, 760 N.W.2d 482 (Mich. 2009)("*Dendel VI*"). On October 7, 2009, the Michigan Supreme Court remanded this case for review of the issue involving Dr. Evans's testimony in light of *Melendez-Diaz* while also denying appeal on the remaining issues. *People v. Dendel*, 773 N.W.2d 16 (Mich. 2009)("*Dendel VII*").

On August 24, 2010 the Court of Appeals issued a published opinion affirming Ms. Dendel's conviction "because, although we hold that a Confrontation Clause violation occurred, the error was harmless beyond a reasonable doubt." *People v. Dendel*, 797 N.W.2d 645, 645 (Mich. Ct. App. 2010) ("*Dendel VIII*").

Ms. Dendel appealed this decision to the Michigan Supreme Court, but the decision was held in abeyance pending the decision in *Michigan v. Bryant*, 131 S. Ct. 1143 (2011). *People v. Dendel*, 793 N.W.2d 240 (Mich. 2011)("*Dendel IX*"). The Michigan Supreme Court then declined to hear the appeal on September 21, 2011. *People v. Dendel*, 802 N.W.2d 618 (Mich. 2011) ("*Dendel X*").

Ms. Dendel timely filed a writ of habeas corpus on the grounds that the state court unreasonably applied federal law to the claims outlined above. On July 22, 2015, the United States District Court, by the Honorable David Lawson, denied the petition but granted a certificate of appealability relating to all issues raised in this brief. RE #11, Opinion and Order, Page ID #1547-1566; Certificate of Appealability, RE #12, Page ID #1567-1569.

Ms. Dendel timely filed her Notice of Appeal on Notice of Appeal on August 20, 2105. Notice of Appeal, RE #14-1, Page ID #1572-1578.

## Summary of Argument

The central question in this case was Mr. Burley's cause of death. The prosecution argued that Ms. Dendel had injected Mr. Burley with insulin while the defense argued that Mr. Burley died of natural causes or killed himself. While the prosecution relied on lay witnesses and several medical experts, the defense presented no expert witnesses of its own and only called Ms. Dendel to testify on her own behalf.

One prosecution witness, Dr. Evans, testified about the results of a toxicology test conducted by AIT. Allowing Dr. Evans to testify about the results of the toxicology test violated Ms. Dendel's rights under the Confrontation Clause of the Sixth Amendment because he did not perform the tests. The Michigan Court of Appeals correctly found that Ms. Dendel's Confrontation rights were violated but incorrectly found that the error was harmless. The trial judge's findings reveals the harmful impact of the improper admission of the AIT test result because the cause of Mr. Burley's death was key in the court's decision.

The Michigan Court of Appeals correctly held that Ms. Dendel was denied the effective assistance of counsel. The Michigan Supreme Court reversed their decision and unreasonably applied Supreme Court law by failing to find ineffective assistance of counsel. Ms. Dendel's trial counsel failed to investigate an alternative

cause of death other than hypoglycemia and failed to call any medical expert witnesses. In the present case, the Michigan Supreme Court misapplied clearly established federal law. It conflated the two *Strickland* prongs and credited the subjective findings of the trial court at the *Ginther* hearing rather than correctly applying the objective test dictated by *Strickland.* The court incorrectly required Ms. Dendel to show a certainty, not probability, that the outcome would have been different.

## **Standard of Review**

On appeal of a denial of a petition for a writ of habeas corpus, this Court reviews the district court's conclusions of law de novo and its factual findings for clear error. *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012).

A federal court must grant a petition for writ of habeas corpus where the state court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d). A court unreasonably applies clearly established law if it either (1) correctly identifies the governing legal principle from the Supreme Court's decisions but then unreasonably applies that principle to the facts of the case, or (2) unreasonably extends, or unreasonably declines to extend, a clearly established legal principle to a new context. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Habeas relief also is warranted where the state court ruling "resulted in a decision that was based on an unreasonable determination in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(d)(2) should be read in conjunction with 28 U.S.C. § 2254(e)(1) which allows the presumption of correctness as to state court factual findings to be rebutted by clear and convincing evidence. However, the performance and prejudice components of an ineffective assistance of counsel inquiry are mixed

questions of law and fact, not subject to the § 2254(e)(1) presumption of correctness.  *Combs v. Coyle*, 205, F.3d 269, 278 (6th Cir. 2000).  When the state court only adjudicates one prong of ineffective assistance claims, but not the other, the unadjudicated prong is reviewed *de novo*. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

I.    THE AIT LAB RESULTS WERE TESTIMONIAL UNDER *MELENDEZ-DIAZ* AND THEIR ADMISSION THROUGH DR. EVANS, WHO DID NOT PERFORM THE TESTS, VIOLATED MS. DENDEL'S RIGHT TO CONFRONT HER ACCUSER

### A. The Lab Results Were Testimonial

A criminal defendant has the right to confront the witnesses against him or her. U.S. Const. amends VI, XIV. In *Melendez-Diaz v Massachusetts,* 557 U.S. 305, 311 (2009), the Supreme Court held that the admission of affidavits that conveyed the results of lab reports, which were produced in response to an investigation, violated a defendant's right to confront his accuser because the technician who processed the information did not testify at trial. Like the lab reports in *Melendez-Diaz*, the AIT lab results were testimonial because they were developed in anticipation of a trial.

The Michigan Court of Appeals correctly ruled that allowing Dr. Evans to testify regarding the results of the toxicology report conducted by AIT violated Ms. Dendel's rights under the Confrontation Clause of the Sixth Amendment because he did not perform the tests. *Dendel VIII*, 797 N.W.2d at 660. However, the Court of Appeals incorrectly held that the error was harmless. *Id.* at 645. Judge Lawson, in denying Ms. Dendel Habeas relief, also agreed that the controlling question was one of harmlessness, holding that the report was testimonial. RE #11, Opinion and

Order, Page ID #1558. This Court should uphold the ruling that the AIT test results were testimonial but find that the error was not harmless.

## B. The Error Was Harmful

The Court of Appeals and Judge Lawson incorrectly found that the admission of the lab reports was harmless error. When reviewing a state-court determination regarding the harmlessness of a non-structural constitutional error, a federal court must determine if the error had a "substantial and injurious effect or influence in determining the jury's verdict . . . that [] resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) (internal quotations omitted). If the reviewing court finds the *Brecht* standard satisfied, the state court has unreasonably applied its harmless error standard as articulated in *Chapman v California,* 386 US 18, 24 (1967). *Foster v. Withrow*, 159 F. Supp. 2d 629, 637 (E.D. Mich. 2001) *aff'd*, 42 F. App'x 701 (6th Cir. 2002); *See also Scott v. Bock*, 241 F. Supp. 2d 780, 792 (E.D. Mich. 2003), *aff'd sub nom.*, *Scott v. Gundy*, 100 F. App'x 476 (6th Cir. 2004). Additionally,

> if the matter is so evenly balanced that the judge has "grave doubts" as to whether the trial error had substantial or injurious effect or influence in determining the jury's verdict, such that the matter is so evenly balanced that he feels himself in a "virtual equipoise" as to harmlessness, the judge must treat the error as if it were harmful and grant the petitioner's writ.
> *Jensen v. Romanowski*, 590 F.3d 373, 378-79 (6th Cir. 2009)
> (internal citations omitted).

When determining harmless error in Confrontation Clause issues, courts analyze the factors suggested by the Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986): "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *See also Stallings v. Bobby*, 464 F.3d 576, 582 (6th Cir. 2006). In the instant case, evaluation of the trial judge's findings reveals the harmful impact of the improper admission of the AIT test results, thus satisfying both the *Van Arsdall* and *Brecht* tests.

The key question in this case was the cause of death; if Mr. Burley died of either a multiple drug overdose or natural causes, there was no crime. In his findings before rendering a verdict, the trial judge stated, "You know, what is the cause of death? We had an autopsy. We had some toxicology studies . . . Also the hypoxic findings in the brain, the kidney, and the zero glucose level . . . I find that he really died from having a zero glucose level… if that's how he died, [how did it] get that low?." RE #8-9, TT, Page ID#1318. Therefore, in determining the pivotal issue, cause of death, the judge relied on two sources and three pieces of evidence. One of these sources, the toxicology report, should not have been admitted. Nevertheless, the Michigan Court of Appeals reasoned that because Dr.

Pacris did not base his findings on the toxicology report, it was not an important piece of evidence. *Dendel VIII*, 797 N.W.2d at 662.

Likewise, Judge Lawson incorrectly found that the report was harmless in light of Dr. Pacris's testimony that a complete lack of glucose suggested that Mr. Burley had been injected with insulin and because defense counsel used the report to show the high levels of morphine in Mr. Burley's body. RE #11, Opinion and Order, Page ID#1559.

However, admission of the report was harmful. The prosecution de-emphasized the morphine findings and emphasized the glucose findings. Dr. Evans stated that the test results were "consistent with, but not proof of," an insulin injection. RE #8-6, TT, Page ID#860. The introduction of the AIT results through Dr. Evans was only valuable to the prosecution in highlighting the zero-glucose level and the inference the prosecution hoped the judge would follow Dr. Evans in making—that the zero glucose level suggested that Mr. Burley was injected with insulin. Since Dr. Evans's testimony was not relevant to anything other than the glucose level found in the toxicology report, its inclusion led the judge to believe that the glucose finding was key to determining the cause of death.[6]

---

[6] This emphasis is also why Dr. Evan's testimony was not cumulative of Dr. Pacris's. Dr. Pacris was called to report on his autopsy findings, specifically that the lethal level of morphine was not the cause of death and that there were signs in the brain and kidney that suggested hypoglycemic shock. Although he testified regarding the glucose levels, that was not the purpose of his testimony, as it was Dr. Evans's.

Because of Dr. Evans's testimony, the glucose level became a central focus of both the prosecution and the trial judge, who did not simply "consider" the finding, as the Court of Appeals asserted. *Dendel VIII*, 797 N.W.2d at 662. It was a central component of his findings, evidenced by the fact that he cited the toxicology report as one of the two sources, and the glucose level as one of the three pieces of evidence, that he relied upon when determining the cause of death. RE #8-9, TT, Page ID#1318.  In his holding, the trial court specifically referenced both the toxicology studies when finding that "he really died from having a zero glucose level." RE #8-9, TT, PAGE

The Michigan Court of Appeals asserted that because the trial judge could have come to the same conclusion without the testimony of Dr. Evans, the error was harmless. *Dendel VIII*, 797 N.W.2d at 662. However, due to the emphasis the judge placed on the glucose results, it is impossible to say that the admittance of the AIT results did not have a "substantial and injurious effect or influence" on the judge's determination resulting in prejudice. *Brecht*, 507 U.S. at 637. The *Brecht* test is therefore satisfied, meaning the Michigan Court of Appeals unreasonably applied federal law. The Court of Appeal's opinion was lacking in justification because it ignored how much the trial court relied upon the toxicology reports in its finding. This Court should overturn the holding that the admission was harmless error.

40

## II.  MS. DENDEL'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHERE TRIAL COUNSEL (A) FAILED TO INVESTIGATE AN ALTERNATIVE CAUSE OF DEATH OTHER THAN HYPOGLYCEMIA, AND (B) FAILED TO CALL ANY MEDICAL EXPERT WITNESSES.

A defendant has a Constitutional right to effective assistance of counsel U.S. Const. amend. VI, and a two-pronged test is employed to determine whether a defendant received ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. When AEDPA applies, the question the court must ask is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). "Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. To show prejudice, a defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In the present case, the Michigan Supreme Court misapplied clearly established federal law. It conflated the two *Strickland* prongs instead of making separate findings of deficiency and prejudice. It also credited the subjective findings of the trial court at the *Ginther* hearing in finding a lack of prejudice

41

rather than correctly applying the objective test dictated by *Strickland* and required

Ms. Dendel to show a certainty, not probability, that the outcome would have been

different.

> **A. Trial Counsel Failed To Fulfill His Duty To Investigate And Contest The Cause Of Death, While Also Failing To Call Any Medical Expert Witnesses.**

The first prong of the *Strickland* standard is that the defendant must show

that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668,

687 (1984). In the present case, the Michigan Supreme Court stated that Ms.

Dendel failed to prove that her trial counsel was ineffective. *Dendel III*, 748

N.W.2d at 870. However, in making this finding, the Michigan Supreme Court

conflated the two *Strickland* prongs, saying "[d]efense counsel was not ineffective

under the test of *Strickland v Washington . . . because* defendant did not prove that

she was prejudiced by her counsel's failure to produce an expert witness." *Id.* at

860 (emphasis added). *Strickland* dictates a two-part test, with an evaluation of

prejudice following a determination of deficient performance. Here, the Michigan

Supreme Court took a finding of a lack of prejudice as conclusive that there was no

ineffective assistance of counsel without determining if counsel was deficient:

"The majority does not conclude that defendant failed to show that counsel's

performance was deficient. Rather, the majority concludes only that defendant was

not denied the effective assistance of counsel, because she failed to show that she

was prejudiced by counsel's performance." *Id.* at 876 n. 10. Therefore, the Michigan Supreme Court unreasonably applied clearly established federal law.

Additionally, the Michigan Supreme Court's cursory conclusion that Ms. Dendel was not denied effective assistance of counsel is itself an unreasonable application of federal law. "[Trial] counsel has a duty to make reasonable investigations," *Strickland*, 466 U.S. at 691, because "[c]ounsel cannot responsibly advise a client about the merits of different courses of action, [and] the client cannot make informed decisions, . . . unless counsel has first conducted a thorough investigation." *Titlow v. Burt*, 680 F.3d 577, 587 (6th Cir. 2012) (quoting *Dickerson v. Bagley,* 453 F.3d 690, 694 (6th Cir.2006)). In determining whether an investigation is necessary, a key factor is the defendant's statements and actions, which counsel relies upon in making strategic decisions. *Strickland*, 466 U.S. at 691.

From the outset of the present case, the cause of death was brought into question due to Dr. Pacris's changing diagnoses.. In the first, Dr. Pacris found Mr. Burley died of natural causes with possible complications related to morphine overdose. RE #8-5,TT, Page ID#805;  RE #8-14, GH, Page ID#1402. It was only after Dr. Pacris was approached by the police, who suggested the possibility of insulin injection, that he changed his diagnosis to "complication of hypoglycemia." RE #8-5, TT, Page ID#803, 807. Considering Dr. Pacris's inconsistent

conclusions, coupled with the multiple medications taken by Mr. Burley and the lethal level of morphine in his blood, trial counsel's failure to investigate the cause of death was deficient.

Trial counsel pursued two primary defense theories: (1) Mr. Burley had committed suicide by injecting himself with insulin, and (2) the prosecution could not prove, beyond a reasonable doubt, that Ms. Dendel killed Mr. Burley. RE #8-14, GH, Page ID#1407-1408. Trial counsel apparently recognized the cause of death as an important issue, as he referenced it in both his opening and closing statements at trial and successfully petitioned for the appointment of an expert for the defense. RE#8-5, TT, Page ID#738; RE#8-9, TT, Page ID#1297; *Dendel III*, 748 N.W.2d at 874. Yet, he did not pursue an active defense in that regard and never called an expert to testify

Ms. Dendel, asserted her innocence in discussions with trial counsel and rejected any suggestion that she would have assisted Mr. Burley in committing suicide. RE #8-14, GH, Page ID#1407. Ms. Dendel also testified that she did not believe Mr. Burley would have committed suicide due to his Catholic faith. RE#8-9, TT, Page ID#1285. Despite this, trial counsel chose to pursue the theory that Mr. Burley had committed suicide as the primary defense. RE #8-14, GH, Page ID#1407-1408.

Trial counsel selected this theory without completing a reasonable investigation of the cause of Mr. Burley's death. His investigation was limited to two phone calls.  RE #8-14, GH, Page ID#1418. The first was a call to a personal friend, Dr. Burgess. *Id.* Trial counsel spoke with Dr. Burgess, a general practitioner, solely to get a referral to a doctor who could provide substantive insight into the specific medical issues in the case.  RE #8-14, GH, Page ID#1430. Trial counsel never provided Dr. Burgess with any documents related to the case. RE #8-14, GH, Page ID#1432. Despite this, trial counsel trusted Dr. Burgess's referral to Dr. Halsey.  RE #8-14, GH, Page ID#1418-1419. As with Dr. Burgess, trial counsel never provided Dr. Halsey with any documents or medical records related to the case.  RE #8-14, GH, Page ID#1432.

Although the consultation involved only one telephone conversation and involved no preparation, trial counsel decided that because Dr. Halsey did not directly contradict the findings of Dr. Pacris based on the information trial counsel verbally relayed to him, investigation into an alternative cause of death was unnecessary RE #8-14, GH, Page ID#1419. At the *Ginther* hearing, trial counsel was unable to recall the exact details of the conversations with either Dr. Burgess or Dr. Halsey because he neither took nor kept any notes or memorialization of his

conversations with either doctor.[7]  RE #8-14, GH, Page ID#1428-1429. As a result, there is no way to know exactly what trial counsel told the doctors in these conversations, particularly whether trial counsel disclosed a full and accurate account of Mr. Burley's medical history or substituted in his own judgment, disclosing only what he felt would be relevant to the case despite his lack of medical expertise.

Calling one doctor for a referral and talking to another doctor over the phone without providing either with medical reports does not suffice as a reasonable investigation into the cause of death. An objectively reasonable counsel would know that such a cursory consultation with a doctor whose specialty trial counsel could not even identify[8] could not be relied upon as accurate. This is magnified by the fact that trial counsel had knowledge of Mr. Burley's doctors, but decided not to contact them regarding his death. *See* RE #8-14, GH, Page ID#1416, 1431-1432.

---

[7] Referencing the fact that trial counsel was relying solely on his memory in testifying about his conversations with both doctors, the following exchange occurred at the *Ginther* hearing during redirect examination:

Appellate Counsel: Okay, so I want to understand you don't remember a lot of this because some time has passed, but so if we found nothing then in the file, then presumably there is no memorialization of that

Trial Counsel: If there's nothing in the file, there's nothing in the file. RH #8-14, GH, Page ID 1428-1429.

[8] At a post-conviction hearing, trial counsel admitted that he did not know what Dr. Halsey's specialty was. RE #8-14, GH, Page ID#1418.

The present case bears a strong likeness to *Couch v. Booker*, 632 F.3d 241, 243 (6th Cir. 2011), where the defendant, Mr. Couch, was a habeas petitioner who had been convicted of second-degree murder in Michigan after helping beat up a man who later died at the hospital. The reported cause of death at the hospital was "asphyxia from inhaled blood that resulted from blunt-force injury to the face." *Id.*

In preparing for the trial, Mr. Couch asked his trial counsel to investigate the cause of death, which counsel did by getting an expert witness. *Id.* at 246. However, much like the present case, trial counsel never provided the expert with a crucial report because he did not obtain a copy. *Id.* The court found that this report would have made a difference since the cause of death was extremely questionable. *Id.* at 247, 249.

At a post-conviction evidentiary hearing, appellate counsel for Mr. Couch called a medical expert who, after looking over the relevant reports, concluded that the cause of death was drug overdose, not asphyxia. *Id.* at 249. Because trial counsel did not fully investigate the cause of death through his failure to acquire a relevant report and provide available evidence to the hired expert, this Court found that the defendant was denied effective assistance of counsel, even under the highly deferential AEDPA standards articulated in *Harrington. Id.* at 244. While the state attempted to claim that the hiring of an expert witness should have been enough, the Court stated: "An attorney cannot hire an expert, give him whatever

evidence he happens to have on hand (but not the evidence the client pointed to) and accept the report without further discussion." *Id.* at 246.

The present case is even more egregious than *Couch*. While Ms. Dendel did not specifically request that trial counsel seek out any specific documents, her statements at trial indicated that a more thorough investigation into the cause of death was necessary, as it was the only reasonable defense. The suicide theory, which trial counsel ultimately pursued with the most vigor, was contradicted by Ms. Dendel's own testimony. RE #8-9, Page ID#1285.

Trial counsel should have investigated the cause of death not only because it was the only viable theory, but, more importantly, because it was such an *obvious* one: the medical examiner returned inconsistent autopsies; Mr. Burley was suffering from a variety of serious ailments and was taking multiple medications when he died; Mr. Burley suffered from pneumonia not long before he died; water was found in Mr. Burley's lungs at the time of death; and Mr. Burley had a lethal level of morphine in his system at the time of death. RE #8-5, Page ID#, 763, 798-799, 805, 812, 829; RE #8-7, Page ID#, 953, 999-1000, 1092; RE #8-9, Page ID#, 1236; RE #8-14, GH, Page ID#1402. "Competent counsel can be expected to undertake a 'thorough investigation of law and facts relevant to plausible options' for the defense." *Couch* 632 F.3d at 246 (quoting *Strickland*, 466 U.S. at 690).

The failure to investigate also resulted in trial counsel's failure to call any expert witnesses to aid in Ms. Dendel's defense. [9] "[T]he failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel[.]" *Byrd v. Trombley*, 580 F. Supp. 2d 542, 546 (E.D. Mich. 2008), *aff'd.*, 352 F. App'x 6 (6th Cir. 2009)(quoting *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005)). Had he investigated the cause of death adequately, trial counsel would have found, with relative ease, an expert witness willing to testify to the inaccuracy of Dr. Pacris's diagnosis.[10]

Trial counsel's performance was therefore deficient because he failed to make a reasonable investigation into a plausible option for the defense. This led to his failure to call any expert witnesses who could have directly contradicted the testimony of the prosecution's experts. By implicitly finding otherwise, the

---

[9] Because of the lack of investigation, trial counsel's failure to produce an expert cannot be classified as a strategic decision. Further, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation . . . If an attorney's "failure to investigate does not reflect sound professional judgment, deference to the attorney's purported strategic choices is not appropriate." *Titlow v. Burt*, 680 F.3d 577, 587-88 (6th Cir. 2012) (internal quotations and citations omitted). *See also Fahrner v. Conerly*, 2:09-CV-11908, 2012 WL 715867, at *11 (E.D. Mich. Mar. 6, 2012) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable . . . A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." (internal quotations and citations omitted)).

[10] At the *Ginther* hearing, appellate counsel presented forensic pathologist Dr. Simson, who testified that Mr. Burley died of a multiple drug overdose. GH, 71. Dr. Simson made this conclusion based largely on the interactions of the multiple drugs in Mr. Burley's system, many of which were respiratory depressants. *Id.* at 89-91.

Michigan Supreme Court unreasonably applied the *Strickland* standard regarding deficient counsel.

### B. Ms. Dendel Was Prejudiced By Trial Counsel's Failure To Investigate And To Call An Expert Witness Because Both Would Have Resulted In The Production Of Evidence And/Or Testimony That Would Have Rebutted The Case Of The Prosecution And Severely Undermined The Result Of The Trial.

The second prong of the *Strickland* test requires a defendant to prove that trial counsel's deficient performance prejudiced him or her. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, a defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

At the *Ginther* hearing, the trial judge found that while Dr. Simson's testimony may have aided the defense, he did not believe there was prejudice because he would not have ruled differently. RE #8-14, GH, Page ID#1537-1538. On appeal, the Michigan Court of Appeals found that Ms. Dendel received ineffective assistance and that she had been prejudiced as a result. *Dendel II*, 2006 WL 2000148 at *2. This ruling was erroneously overturned by the Michigan Supreme Court, which said that she was not prejudiced by trial counsel's performance. *Dendel III*, 748 N.W.2d at 860.

The Michigan Supreme Court recognized the objective standard for prejudice articulated in *Strickland*, but instead applied a subjective and heightened standard contrary to—or, in the alternative, as an unreasonable application of—clearly established federal law. *See Williams v. Taylor*, 529 U.S. 362, 405-08 (2000).

### i. The Michigan Supreme Court used a subjective and heightened standard to evaluate prejudice, contrary to clearly established federal law, thus allowing this Court to conduct a de novo review of Ms. Dendel's claims

In reviewing for prejudice, the Michigan Supreme Court did not ask whether Ms. Dendel established an objectively "reasonable probability" that the outcome of the trial would have been different, as dictated by *Strickland*, but instead relied on the trial court's findings of credibility as conclusive. The Court recast the trial court's findings regarding prejudice, which are findings of law, as findings of fact:[11]

> After hearing the testimony of Dr. Simson and Dr. Pacris, the trial court concluded that Dr. Simson's testimony would not have changed the outcome of the trial. By declining to conclude that Dr. Simson's testimony had effectively refuted the testimony of Dr. Pacris, the trial court implicitly held that Dr. Simson was not more credible than the prosecution's experts.[12]
> *Dendel III*, 748 N.W.2d at 867.

---

[11] The language cited by the Michigan Supreme Court regarding the testimony of Dr. Simson not changing the trial court's determination was explicitly part of the trial court's discussion of the "second prong" of *Strickland*: prejudice. RE #8-14, GH, Page ID#1537-1538

[12] Of particular import to the Michigan Supreme Court with regard to crediting one expert witness over another was that, according to them, Ms. Dendel herself contradicted the testimony of Dr. Simson. *Dendel III*, 748 N.W.2d at 868. ("After defendant's arrest, she told both police detectives and defense counsel that Burley had injected himself with insulin."). This, however is a quote deprived of context resulting in an inaccurate portrayal of the exchange. In reality, the quote came from an exchange between detectives and Ms. Dendel, as testified to by Detective Gary Schuette at trial:

Det. Schuette: I told Ms. Dendel that the possible cause of death was hypogly — excuse me — hypoglycemic shock due to the injection of insulin.

As a result, the Court examined this determination for clear error. *Id.* After finding

none, the Court determined that:

> For all these reasons, we have no cause to believe that if Dr.
> Simson had testified at trial, the trial court would have given
> more weight to his testimony than that of the prosecution's
> experts. We conclude that defendant did not establish a
> "reasonable *probability*" that the outcome of the trial would
> have been different had Dr. Simson testified. *Id*. at 868.
> (emphasis in original)

The Court therefore found that because the trial court had not committed clear

error in a credibility determination, Ms. Dendel was not prejudiced. *Id.*

By using a clear error standard and deferring to the trial court's

determination as a result, the Michigan Supreme Court transformed the *Strickland*

test for prejudice, which asks whether there was a reasonable probability that the

outcome of the trial would have been different, into a subjective determination of if

the trial court would have convicted the defendant even if all of the evidence that

---

Prosecutor Bates: And did she have a response to that?

Det. Schuette: Yes, she did.

Prosecutor Bates: What did she say?

Det. Schuette: She told me "that poor dear, he killed himself for me."

RE #8-9, TT, Page ID#1196

There is a significant difference between a response to a detective's statement
during an interrogation, and (the Michigan Supreme Court's characterization of) an
unprompted affirmative assertion that Mr. Burley killed himself. Again, it is
important to take note of Ms. Dendel's own testimony at trial, the only affirmative
statements she made on the record, during which she stated she did not believe Mr.
Burley would have killed himself. RE #8-9, TT, Page ID #1196.

eventually came to light was presented at trial. While Judge Lawson's opinion indicates that the Michigan Supreme Court used an objective test, because the Michigan Supreme Court said that it was using an objective test in a footnote, the Court clearly was not using an objective test because it used a clear error standard and deferred to the trial court's determination. RE #11, Opinion and Order, Page ID#1561.

If the Michigan Supreme Court's test were followed, trial courts would have the last word on the issue of prejudice since the reviewing courts would wholly defer to their findings. This is the wrong test, and applying it was contrary to clearly established federal law. *See Couch v. Booker*, 632 F.3d 241, 248 (6th Cir. 2011) (quoting *Rompilla v. Beard*, 545 U.S. 374, 393 (2005))("[A]lthough we suppose it is possible that a jury could have heard [all of the evidence presented] and still have decided [as it did], that is not the test.").

In addition to converting an objective test into a subjective one, the reasoning employed by the Michigan Supreme Court required Ms. Dendel to show more than a probability that the outcome of the trial would have been different. For example, the court noted that Dr. Simson did not *conclusively refute* Dr. Pacris's testimony that Burley had died of an insulin overdose[.]" *Dendel* III, 748 N.W.2d at 868 (emphasis added). The court implied that in order to find that Dr. Simson's testimony met the standard of undermining confidence in the outcome, he must

have conclusively refuted the other side's experts. This is not required by the standard set forth in *Strickland*.

Further, by focusing on what the trial court *would have done*, the court required Ms. Dendel to show that the outcome would in fact have been different, not that there was a *reasonable probability* that it would have been different. The dissent characterized the heightened standard, saying:

> [T]he majority opinion seems to misapprehend defendant's burden. It would seem to require defendant to prove that she is actually innocent of the crime in order to be entitled to relief. Even though defendant might be innocent, this is not the standard. The standard is "a probability sufficient to undermine confidence in the outcome. *Id.* at 878 (Kelly, J., dissenting).

It is well established that to require *absolute certainty* that the outcome would have been different is too great a burden of proof to place on the defendant. *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th. Cir. 2001) (citing *United States v. Day*, 969 F.2d 39, 45 n.8 (3rd Cir. 1992) (noting that "*Strickland v. Washington* does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires

only 'reasonable probability' that that is the case")). Contrary to federal law, the Michigan Supreme Court did just that.[13]

When a court below is found to have utilized a test or analysis that is contrary to clearly established federal law, the reviewing court is then free to engage in de novo review of the petitioner's claim under the controlling law. *Magana*, 263 F.3d at 551 (citing *Williams v. Taylor*, 529 U.S. 362, 396-98 (2000) (utilizing de novo review to determine how counsel's errors at sentencing prejudiced petitioner); *Id.* at 414 (O'Connor, J., concurring) (utilizing de novo review after pointing out that it was "impossible to determine" to what extent the state court's erroneous view of the law colored its finding that the petitioner suffered no prejudice)). After such a review, it is clear that the evidence presented at trial and at the *Ginther* hearing undermines confidence in the outcome of the trial. As the Michigan Court of Appeals noted:

> Particularly where, as here, the determination of the victim's cause of death is entirely dependent on the scientific expertise and testimony of a forensic pathologist, and where the defendant's guilt or innocence is inextricably linked to the victims cause of death, the failure to consult with or present the

---

[13] At the very least, the Michigan Supreme Court required Ms. Dendel to prove by a preponderance of the evidence that the outcome would have been different, which is also contrary to federal law. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (noting that if a state court requires a defendant to prove by a preponderance of the evidence, as opposed to a reasonable probability, that the outcome would have been different, that would be contrary to clearly established Supreme Court precedent); *See also Rose v. Lee*, 252 F.3d 676, 689 (4th Cir. 2001) (noting that it was contrary to federal law to require a state habeas petitioner to prove that the outcome would be different by a preponderance of the evidence).

testimony of a forensic pathologist constitutes overwhelming evidence of prejudice. *Dendel II*, 2006 WL 2000148 at *4.

Dr. Simson's testimony offered the trier of fact a credible, alternative theory of causation, which was completely consistent with the anatomical findings and the timeline offered by Ms. Dendel. When Dr. Simson's testimony is combined with the inconsistent reports and self-contradicting testimony of Dr. Pacris at the *Ginther* hearing, the reliability of the outcome of the trial is severely undermined.

While the Michigan Supreme Court stated that there was "strong" circumstantial evidence supporting Ms. Dendel's conviction, *Dendel III,* 748 N.W.2d at 868, when it is examined closely, it is quite weak. *See infra* note 17. Even under AEDPA, it would be difficult to justify deferring to such a mischaracterization to conclude that the confidence in the decision has not been undermined. Further, the present case presents a sincere question of innocence wherein even small mistakes by trial counsel can result in prejudice under an ineffective assistance analysis. *See Couch*, 632 F.3d at 249 (stating that the ineffective assistance was particularly harmful because "of 'the lack of overwhelming evidence of guilt' with respect to Couch.").

> **ii. The Michigan Supreme Court's analysis constitutes an unreasonable application of clearly established federal law because it recognized the correct legal principles, but failed to apply them correctly**

While Judge Lawson correctly found that "Dr. Simpson's testimony… cast considerable doubt on the state's theory that Paul Michael Burley died from an insulin overdose", he incorrectly found that the standards under AEDPA were not met. RE #11, Opinion and Order, Page ID# 1561-1562. The Michigan Supreme Court's opinion was an unreasonable application of federal law.

The Michigan Supreme Court, in its opinion in the present case, recognized that "to demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different," and that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Dendel III,* 748 N.W.2d at 865 (quoting *Strickland*, 466 U.S. at 694). The court also recognized that "the fact-finder's determination on that issue at the *Ginther* hearing is not binding on the appellate courts." *Dendel III,* 748 N.W.2d at 868 n. 17. They went on to say, "the test for prejudice is an objective test and that appellate courts should not simply defer to the trial court's judgment regarding prejudice, even if the trial court was the fact-finder at the original trial, as in this case." *Id.*

Despite accurate references to the applicable legal principles, the court unreasonably applied them to the facts of the case in light of the standard articulated in *Strickland*. Therefore, if the Court is not persuaded that this application was contrary to clearly established federal law, it can also be viewed as

an unreasonable application thereof. . The cause of death was key in this case and yet, trial counsel called no experts or medical professionals to refute the prosecution's witnesses or theory of the case. Dr. Simson's testimony cast "considerable doubt on the state's theory" and showed that Ms. Dendel was denied the effective assistance of counsel.

In conclusion, the Michigan Supreme Court failed to utilize and/or correctly apply clearly established federal law, which is why it failed to find that Ms. Dendel's trial counsel's multiple, serious mistakes severely prejudiced her and led directly to her conviction. *See Id.* at 873, (Kelly, J., dissenting) ("Because there is a reasonable possibility that defendant is innocent and her counsel's performance deprived her of her only viable defense, I believe she is entitled to a new trial."). In light of this, she is entitled to a new trial.

## **Conclusion and Relief Sought**

Petitioner Katherine Dendel respectfully requests that this Honorable Court reverse the decision of the District Court below and grant her petition for a writ of habeas corpus.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

BY:   s/ Valerie Newman

**VALERIE R. NEWMAN (P47291)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

BY:   s/ Kristin Lavoy
**KRISTIN LAVOY (P71145)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Date: November 4, 2015

## <u>Certificate of Compliance</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,347 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in14-point Times New Roman type style.

BY:   <u>s/ Valerie Newman</u>

**VALERIE R. NEWMAN (P47291)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

BY:   <u>s/ Kristin Lavoy</u>
**KRISTIN LAVOY (P71145)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833

Date: November 4, 2015

## Certificate of Service

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on November 5, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


BY:    s/ Valerie Newman
       **VALERIE R. NEWMAN (P47291)**
       Assistant Defender
       3300 Penobscot Building
       645 Griswold
       Detroit, Michigan  48226
       (313) 256-9833
       vnewman@sado.org


BY:    s/ Kristin Lavoy
       **KRISTIN LAVOY (P71145)**
       Assistant Defender
       3300 Penobscot Building
       645 Griswold
       Detroit, Michigan  48226
       (313) 256-9833

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Description of Entry | Date | Record Entry No. | Page ID Number |
|---|---|---|---|
| Register of Actions | 07/30/13 | RE #7-1 | Page ID #95-101 |
| Video Hearing | 11/21/06 | RE #7-2 | Page ID #105-120 |
| Motion Hearing | 06/17/08 | RE #7-3 | Page ID #121-142 |
| Court of Appeals (2nd Remand) | 08/24/10 | RE #7-4 | Page ID #143-398 |
| Supreme Court | 08/28/08 | RE #7-5 | Page ID #399-543 |
| Supreme Court | 09/21/11 | RE #7-6 | Page ID #544-593 |
| Preliminary Examination | 06/14/02 | RE #8-1 | Page ID #598-698 |
| Arraignment | 07/09/02 | RE #8-2 | Page ID #699-703 |
| Pretrial | 09/26/02 | RE #8-3 | Page ID #704-708 |
| Pretrial | 01/29/03 | RE #8-4 | Page ID #709-720 |
| Trial Transcripts | 02/03/03 | RE #8-5 | Page ID #721-854 |
| Trial Transcripts | 02/03/03 | RE #8-6 | Page ID #855-888 |
| Trial Transcripts | 02/04/03 | RE #8-7 | Page ID #889-1141 |
| Trial Transcripts | 02/04/03 | RE #8-8 | Page ID #1142-1161 |
| Trial Transcripts | 02/05/03 | RE #8-9 | Page ID #1162-1332 |
| Sentencing | 03/12/03 | RE #8-10 | Page ID #1333-1372 |
| Video Hearing | 09/23/03 | RE #8-12 | Page ID #1373-1281 |

| Motion Hearing | 03/23/04 | RE #8-13 | Page ID #1382-1395 |
| Ginther Hearing | 08/26/05 | RE #8-14 | Page ID #1396-1541 |
| Opinion and Order Denying the Petition for Writ of Habeas Corpus | 07/22/15 | RE #11 | Page ID #1547-1566 |
| Certificate of Appealability | 07/22/15 | RE #12 | Page ID #1567-1569 |
| Habeas Corpus Order | 07/22/15 | RE #13 | Page ID #1570 |
| Notice of Appeal | 08/20/15 | RE #14 | Page ID #1572-1578 |